In re Robert V. NUGENT, Sr. and Marion Nugent, Debtors.

In re Anuco, Inc., Debtor.

Robert V. Nugent, Sr. and Marion Nugent; and Anuco, Inc., Plaintiffs,

v.

Business Cards Tomorrow, Inc., Defendant.

Bankruptcy Nos. 97–23503, 97–23196. Adversary No. 97–2533.

United States Bankruptcy Court, D. New Jersey.

Nov. 30, 1998.

Greiner & Langer by Jerrold I. Langer, Charles Panzer, Parsippany, NJ, for Robert V. Nugent, Sr. and Marion Nugent.

Middlebrooks & Shapiro by Richard P. Shapiro, Parsippany, NJ, for Anuco, Inc.

Forman, Holt & Eliades by Daniel M. Eliades, Joseph M. Cerra, Paramus, NJ, for Business Cards Tomorrow, Inc.

## *OPINION*

ROSEMARY GAMBARDELLA, Chief Judge.

### MATTER BEFORE THE COURT

In their Adversary Complaint against Business Cards Tomorrow ("BCT"), Chapter 11 Debtors Robert V. Nugent, Sr., Marion Nugent, and Anuco, Inc. ("Anuco") (collectively, "Debtors") seek a determination that: (1) they do not constitute franchisees under a certain franchise agreement; (2) they are not personally liable to BCT for any damages in connection with the franchise agreement, or alternatively, that they are liable for a reduced amount; and (3) royalty fees ceased to accrue upon rejection of the franchise agreement, and that the Court must therefore modify pursuant to 11 U.S.C. § 365(g) and § 502 the

damages awarded in BCT's state court action against Debtors.

BCT moves for the entry of an order granting summary judgment on the Debtors' Adversary Complaint.

Debtors also filed separate motions for the entry of an order providing for the estimation of BCT's claim against Anuco pursuant to § 502(c).

The Court conducted a hearing concerning these motions on March 31, 1998. The following constitutes this Court's findings of fact and conclusions of law.

### FACTS

BCT is a franchise specializing in the wholesale printing business. *See* Adversary Complaint ¶ 5.

In late 1987, Robert Nugent, Jr., son of Robert V. Nugent, Sr. and Marion Nugent (collectively, the "Nugents"), borrowed approximately $240,000.00 from the Nugents in order to facilitate the purchase of an existing BCT franchise located in East Hanover, New Jersey (the "East Hanover BCT Franchise"). *See id.* ¶¶ 6–8.

On March 10, 1988, BCT and Anuco executed a franchise agreement (the "Franchise Agreement"), pursuant to which Anuco became franchisee of the East Hanover BCT Franchise. *See id.* ¶ 11. *See also* Franchise Agreement. Robert Nugent, Jr., as President of Anuco, signed the Franchise Agreement. *See id.* ¶ 11. The Franchise Agreement identifies BCT as "Franchisor" and Anuco, Inc., Robert V. Nugent, Sr. and Marion Nugent, collectively, as "Franchisee." *See* Franchise Agreement at 1.

The Franchise Agreement obligates the "Franchisee" to pay BCT, as "Franchisor," during the term of the Franchise Agreement, "a continuing Royalty Fee of 6% of the Franchisee's Gross Sales for the use of Franchiser's trademarks, trade names and B.C.T. system." *Id.* at 3. It also provides that "[t]he royalty fee will be five (5%)

percent for the first year of operation."
*Id.*

The Franchise Agreement provides BCT with the option of terminating "Franchisee's rights and Franchise hereunder ... if Franchisee commits a material breach of the Franchise Agreement or if he materially defaults in the payment of any indebtedness to the Franchisor...." *Id.* at 10.

With regard to its termination, the Franchise Agreement provides in part that:

> [u]pon termination for any reason, Franchisee shall immediately pay all monies due Franchisor under this Franchise Agreement, and otherwise as a result of any purchase of supplies or inventories from [BCT] or any division thereof. Upon termination of this Agreement, all Franchisee's rights hereunder shall terminate and Franchisee shall cease to use any copyrights or other trade secrets and all ... trademarks, service marks and trade names, paper or plastic goods, emblems and displays with the Franchisor's names imprinted thereon....

*Id.* at 12.

The Nugents assert that they executed the Franchise Agreement only in their respective capacities as Anuco's "nominal Vice–President" and "nominal Secretary." *See* Adversary Complaint ¶ 23. The Nugents also assert that BCT never requested that they serve as individual franchisees under the Franchise Agreement. *See id.* ¶ 22. They also maintain that they never agreed to serve in such a capacity. *See id. See also* Affidavit of Marion Nugent in Opposition to Motion For Summary Judgment; Affidavit of Robert Nugent, Sr. in Opposition to Motion For Summary Judgment.

They also assert that "[a]fter the Franchise Agreement was signed by BCT, Robert Nugent, Jr. and [the Nugents], certain material provisions of the Franchise Agreement were altered by BCT and Anuco." *Id.* ¶ 15. They maintain that while Robert Nugent, Jr. and Marion Nugent

initialed such alterations, "Robert Nugent, Sr. did not initial such material alterations, nor was he aware of such material alterations." *Id.*

From March 1988 to May 1991, Anuco operated as Franchisee of the East Hanover BCT Franchise. *See id.* ¶ 17. *See also* Certification of Robert Nugent, Jr. in Support of Anuco's Motion to Estimate Claims ¶ 25 ("After [1991], [Anuco] did not use or operate as a BCT franchise.").

On November 4, 1991, BCT filed a Complaint for Damages and Equitable Relief (the "State Court Action") in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County (the "State Court") against Anuco, Robert V. Nugent, and Marion Nugent for breach of the Franchise Agreement. *See* Certification of Gregory Willis, Esq. ("Willis Certif.") ¶ 2; Complaint. BCT sought damages resulting from Debtors' failure to pay royalties pursuant to the Franchise Agreement. *See id.* The "General Allegations" portion of the State Court Action provides in relevant part:

> 3. That on or about March 10, 1988, the parties entered into a Franchise Agreement....

\* \* \*

> 5. That defendants are the Franchisees under said Franchise Agreement.

*Id.*

Count II of the State Court Action provides in relevant part:

> 6. That defendants filed royalty reports through May 10, 1991, reflecting royalties due the plaintiff in the approximate sum of $74,251.30, however, Defendants have to date failed and refused to pay said royalties, as required of them under paragraph 4 of the aforementioned franchise agreement.
> 7. That Defendants have have [sic] failed and refused to file their royalty reports since May 10, 1991, as required of them under paragraph 4 of the aforementioned franchise agreement.

8. That plaintiff has performed all conditions precedent, required of it.

*Id.*

In their Answer and Affirmative Defenses (the "Answer"), Debtors asserted that BCT had engaged in deceptive and unfair trade practices, misrepresentation, fraud and unconscionable sales practices. *See id.* ¶ 2; Answer. In response to General Allegation No. 5, Debtors responded, "Admitted." *See* Answer ¶ 5. The Answer also refers to a "Counterclaim." *See id.* ¶ 10 ("As their First Affirmative Defense, Defendants would state that the Franchise Agreement was procured through fraud as set forth more fully in the Counterclaim. . . ."). The parties have not provided a copy of this Counterclaim.

The parties conducted discovery over the course of the next five years. *See id.* ¶ 3. BCT's counsel for the State Court Action asserts that "both sides certified that they [sic] were ready to proceed as of that date." *Id.*

On February 3, 1997, the matter proceeded to trial before a judge and jury. *See id.* On February 10, 1997, the jury returned a unanimous verdict in favor of BCT and awarded damages of $938,000.00. *See id.* ¶ 5.

Debtors filed post-trial motions for judgment notwithstanding the verdict and/or for a new trial. *See id.* ¶ 6. BCT filed post-trial motions for counsel fees, taxation of costs, and pre-judgment interest. *See id.*

On or about March 20, 1997, Anuco filed a petition under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). *See* Certification of Charles N. Panzer ("Panzer Certif.") ¶ 5. On that same date, Anuco filed a motion for the entry of an order authorizing it to reject the Franchise Agreement. *See* Notice of Motion For Entry of Order Authorizing Debtor to Reject Franchise Agreement.

On March 25, 1997, the Nugents filed a petition under Chapter 11 of the Bankruptcy Code. *See* Panzer Certif. ¶ 5.

On or about March 26, 1997, the State Court conducted a hearing concerning post-trial motions. *See* Willis Certif. ¶ 7. The State Court denied Debtors' post-trial motions and entered an order awarding counsel fees to BCT. *See id.* Due to the Nugents' and Anuco's petition filings, however, the State Court vacated these orders. *See* BCT's Application in Support of Motion For Summary Judgment ¶ 9.

On April 9, 1997 BCT filed a motion requesting the establishment of the effects of Anuco's purported rejection of the Franchise Agreement. *See* Notice of Motion Establishing Effects of Rejection of Franchise Agreement.

On July 3, 1997, the Nugents filed the Adversary Complaint upon which this adversary proceeding is based. *See* Adversary Complaint.

In Count I of their Adversary Complaint, the Nugents seek a determination "[the Nugents] are not personally liable to BCT as franchisees under the Franchise Agreement." Adversary Complaint ¶¶ 21–25. They allege that "[b]y signing the Franchise Agreement in their capacities as nominal officers of Anuco, [the Nugents] cannot be personally liable to BCT under the Franchise Agreement." *Id.* ¶ 25.

In Count II, the Nugents seek a determination "that, if BCT claims that [the Nugents] are franchisees along with Anuco, or that [the Nugents] are somehow guarantors of Anuco's obligations under the Franchise Agreement, the Franchise Agreement is void as to [the Nugents]." *Id.* ¶¶ 26–28. The Nugents allege, specifically, that "the Franchise Agreement is void as to [the Nugents] because it was materially altered by BCT and Anuco without [the Nugents'] explicit or informed consent." *Id.* ¶ 28.

In Count III, the Nugents seek a determination that "any liability of [the Nugents] for unpaid royalty fees under the Franchise Agreement would include liability only for unpaid royalty fees that ac-

crued prior to the July 14, 1991 termination date of the Franchise Agreement." *Id.* ¶¶ 29–33. They allege, specifically, that "[t]he term of the Franchise Agreement ended in May 1991 when BCT ceased operating as a BCT Franchise under the Franchise Agreement," and therefore, that "no royalty fees are owed under the Franchise Agreement for any period after the term of the Franchise Agreement ended in May 1991." *Id.* ¶¶ 31, 33.

On July 25, 1997, BCT filed separate proofs of claim, each in the amount of $1,262,080.00, in the Nugents' and Anuco's respective bankruptcy proceedings. *See* Proofs of Claim Dated July 25, 1997.

On August 15, 1997, this Court entered an order declaring that Anuco's "non-monetary obligations" under the Franchise Agreement, including a covenant not to compete, "survive notwithstanding [Anuco's] rejection of the Agreement under 11 U.S.C. § 365." Order Establishing Certain Effects of Debtor's Rejection of Franchise Agreement.

On September 19, 1997, this Court entered an order granting, subject to this Court's August 15, 1997 Order, Anuco's application to reject the Franchise Agreement. *See* Order Authorizing Rejection of Franchise Agreement. Pursuant to this order, the Court deemed rejected, as of the filing date of Anuco's case, the Franchise Agreement as between BCT and Anuco. *See id.*

On September 23, 1997, Anuco filed a motion for the entry of an order providing for the estimation and determination of BCT's claim pursuant to § 502. *See* Notice of Cross–Motion For Entry of Order For Estimation of BCT's Claim.

On November 12, 1997, this Court entered orders granting BCT's motions for relief from the automatic stay in Anuco's and the Nugents' respective bankruptcy cases for the purpose of allowing the State Court to enter judgment in the State Court Action. *See* Order Granting Limited Relief From Automatic Stay ("The Mo-

tion is hereby granted for the limited purpose of modifying the automatic stay to permit BCT to proceed to enter final judgment in the Florida Action including the fixing of costs, legal fees, and pre-judgment interest...."); Order Granting BCT's Motion Pursuant to Section 362(d)(1) ("[T]he action ... may proceed so that the Florida court may fix counsel fees, costs, and pre-judgment interest and enter final judgment."). Each order provides that "[t]he foregoing is without prejudice to the Debtors' right to object to the claim of BCT." *Id.*

On January 6, 1998, the State Court, after conducting hearings, denied Debtors' motion for judgment notwithstanding the verdict or for a new trial, and entered final judgment in the amount of $1,217,683.30 in favor of BCT (the "State Court Judgment"). *See* Final Judgment ("This Cause having been tried to a jury commencing February 3, 1997, the jury having rendered a verdict on February 10, 1997, and the Court having denied the defendants' motions for new trial, pursuant to the verdict rendered in this action on February 10, 1997...."). *See also* Willis Certif. ¶ 9.

On January 20, 1998, the State Court entered an order awarding attorneys' fees and costs in the amount of $124,023.61 in favor of BCT. *See* Final Judgment For Attorney Fees and Costs.

On January 28, 1998, BCT filed amended proof of claims, each in the amount of $1,331,347.70, in Anuco's and the Nugents' respective bankruptcy proceedings. *See* Proofs of Claim Dated January 28, 1998.

On February 5, 1998, Debtors filed an appeal of the State Court Action to the District Court of Appeal for the Fourth District (the "Florida Court of Appeal"). *See* Notice of Appeal.

On February 10, 1998, the Court entered an order authorizing Anuco to intervene as a party plaintiff in this adversary proceeding. *See* Order Authorizing Anuco to Intervene.

On February 23, 1998, BCT filed the present motion requesting the entry of an order granting summary judgment in this adversary proceeding. *See* BCT's Notice of Motion For Summary Judgment Dismissing Plaintiffs' Complaint With Prejudice.

On February 24, 1998, the Nugents filed their own motion for the entry of an order providing for the estimation and determination of BCT's claim pursuant to § 365(g) and § 502. *See* Notice of Motion For Court Estimation and Determination of Claim.

On February 26, 1998, BCT filed in the Nugents' case a motion for the entry of an order allowing and/or expunging claims. *See* Notice of Motion For Order Allowing and/or Expunging Claims.

## DISCUSSION

The Court addresses two issues: (1) whether BCT is entitled to summary judgment on the Adversary Complaint; and (2) whether BCT's claim is eligible for estimation pursuant to § 502(c).

## I. Motion For Summary Judgment

In their Adversary Complaint, Debtors seek a determination that: (1) they do not constitute Franchisees under the Franchise Agreement; (2) the Franchise Agreement is void; and (3) they do not owe royalty fees accruing after May 1991.[1] *See* Adversary Complaint.

In moving for summary judgment on the Adversary Complaint, BCT argues that the Nugents raise claims "that were or could have been raised" in the State Court Action, and consequently, the doctrines of res judicata, collateral estoppel, and entire controversy bar the litigation of these claims. *See* BCT's Brief in Support of Motion For Summary Judgment ("BCT's Summary Judgment Brief").

In opposition to BCT's motion for summary judgment, Debtors argue, first, that as a result of Anuco's rejection of the Franchise Agreement, this Court *must* determine BCT's claims for damages under the agreement pursuant to § 365(g) and § 502. *See* Nugents' Memorandum of Law in Opposition to Motion For Summary Judgment ("Nugents' Summary Judgment Brief") at 10–11. Debtors argue, second, that this Court must adjudicate this matter on the basis of its core jurisdiction over this proceeding. *See id.* at 12. Debtors argue, third, that because the orders lifting the automatic stay preserved their right to object to its claim, BCT cannot rely upon that judgment in seeking to dismiss the Adversary Complaint on the basis of res judicata. *See id.* at 12–13, 19–20. They argue, fourth, that this Court should exercise its "equitable power" to "reevaluate" the State Court's judgment. *See id.* at 14–16. Debtors argue, fifth, that the facts supporting BCT's claim "drastically changed" during the interval between the return of the jury verdict and the State Court's entry of judgment, and hence, that they could not have raised their claims before the State Court. *See id.* at 20–22. They argue, sixth, that application of preclusion doctrines would not further the policies of judicial economy. *See id.* at 23–24. They argue, seventh, that this Court, in adjudicating this proceeding, would not function as an appellate court, and consequently, the Rooker–Feldman doctrine does not apply. *See id.* at 25–26. Finally, the Nugents argue that they did not receive due process before the State Court. *See id.* at 23.

### A. Fed.R.Civ.P. 56

Federal Rule of Civil Procedure 56, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, provides in relevant part that summary judgment shall be granted "[i]f the pleadings, deposition, answers to interrog-

---

1. The Nugents filed the Adversary Complaint. *See* Adversary Complaint. Earlier this year, the Court entered an order authorizing Anuco to intervene as a party plaintiff. *See* Order Authorizing Anuco to Intervene.

atories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

The Supreme Court has explained that Rule 56(c) requires "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, "a motion for summary judgment must be granted unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987).

In evaluating a motion for summary judgment, a court must consider the evidence in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). The party opposing summary judgment, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Therefore, "[i]f the evidence [offered by the non-moving party] is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citation omitted).

**B. Res Judicata**

██ The doctrine of res judicata, or claim preclusion, bars a party from litigating in a subsequent proceeding "claims that 'were or could have been raised' in a

prior action involving the 'parties or their privies' when the prior action had been resolved by a 'final judgment on the merits.'" *In re Graham,* 973 F.2d 1089, 1093 (3d Cir.1992) (quoting *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). The doctrine "thus bars relitigation of any claim that could have been raised in the prior action even if its was not so raised." *Id. See also In re Lewison Bros.,* 162 B.R. 974, 981 (Bankr.D.N.J. 1993) ("Res judicata is designed to preclude the relitigation of issues which have been fairly and finally determined.").

The United States Court of Appeals for the Third Circuit (the "Third Circuit") has held that "[a] judgment that is final and therefore res judicata in the courts of one state ordinarily must be given full faith and credit by all other courts in the United States." *Flood v. Braaten,* 727 F.2d 303, 308 (3d Cir.1984). *See also Sullivan v. City of Pittsburgh,* 811 F.2d 171, 181 (3d Cir.1987) ("Section 1738 [of Title 28] requires federal courts to give a state court judgment preclusive effect to the same extent the courts of the rendering state would.").

██ The Third Circuit has also stated that "[i]n determining the preclusive effect of a state court judgment, we apply the rendering state's law of res judicata." *McNasby v. Crown Cork and Seal Co.,* 888 F.2d 270, 271 (3d Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1783, 108 L.Ed.2d 784 (1990). *See also Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 381, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) ("[Section] 1738 [of Title 28] requires a federal court to look first to state preclusion law in determining the preclusive effects of a state court judgment."). In this case, BCT argues that res judicata bars the relitigation of the State Court Action. The Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida entered the State Court Judgment. *See* Final Judgment. Thus, in determining the preclusive effect of the

State Court Action, this Court applies Florida law.

 The Supreme Court of Florida has held that:

> [t]he general principle behind the doctrine of res judicata is that a final judgment by a court of competent jurisdiction is absolute and puts to rest every justiciable, as well as every actually litigated, issue. However, this principle only applies when the elements of res judicata are present and the doctrine is properly applied. Where the second suit is upon the same cause of action and between the same parties as the first, res judicata applies. The first judgment is conclusive as to all matters which were or could have been determined. It has been well settled by this Court that several conditions must occur simultaneously if a matter is to be made res judicata: identity of the thing sued for; identity of the cause of action, identity of parties; identity of the quality of the person for or against whom the claim is made.

*Albrecht v. State*, 444 So.2d 8, 11–12 (Fla. 1984) (citations omitted).

 The *Albrecht* Court added that:

> [i]t is also a settled rule that when the second suit is between the same parties, but based upon a different cause of action from the first, the prior judgment will not serve as an estoppel except as those issues actually litigated and determined in it. Therefore, if the cause of action is not the same there will be no estoppel as to those issues which could have been litigated in the previous action. The determining factor in deciding whether the cause of action is the same is whether the facts or evidence necessary to maintain the suit are the same in both actions.

*Id.* at 12 (citations omitted). *See also Gordon v. Gordon*, 59 So.2d 40, 44 (Fla.1952) ("[U]nder res adjudicata a final decree of judgment bars a subsequent suit between the same parties based upon the same cause of action and is conclusive as to all matters germane thereto that were or could have been raised. . . .").

 In applying res judicata, Florida courts have also required that "the original claim be disposed of on the merits." *Florida Patient's Compensation Fund v. St. Paul Fire & Marine Ins. Co.*, 535 So.2d 335, 336 (Fla.Dist.Ct.App.1988) (citing *Kent v. Sutker*, 40 So.2d 145 (Fla.1949)).

 In this case, BCT argues, on the basis of the State Court Judgment, that res judicata bars the litigation of Debtors' claims. *See* BCT's Summary Judgment Brief at 11.

After reviewing the pleadings and evidence presented in the State Court Action and in this case, the Court finds that the elements necessary for the application of res judicata are satisfied.

1. Identity of "The Thing Sued For"

 First, in both cases, Debtors seek relief from liability under the Franchise Agreement. Thus, identity of "the thing sued for" exists. *See generally University Drive Prof'l Complex, Inc. v. Fed. Sav. and Loan Ins. Corp. (In re University Drive Prof'l Complex, Inc.)*, 101 B.R. 790, 793 (Bankr.S.D.Fla.1989) (finding "identity of the thing sued for" under Florida law in case in which debtor, having previously defended foreclosure action initiated by the Federal Savings and Loan Insurance Corporation, filed adversary proceeding involving same facts against same entity). Further, to the extent that the remedy sought in this case *does* differ from that previously sought, the Court notes that such a fact does not prevent the application of claim preclusion. *See Brennan v. Lyon*, 915 F.Supp. 324, 329 (M.D.Fla.1996) (applying claim preclusion under Florida law against party seeking "a different remedy in this case under the RICO laws than he did in ... earlier actions"); *Maison Grande Condominium Ass'n. v. Dorten, Inc.*, 621 So.2d 762, 764 (Fla.Dist.Ct.App. 1993) ("[A] request for different relief does

not prevent the first proceedings from serving as a bar to a second action.") (quoting *Pumo v. Pumo*, 405 So.2d 224 (Fla.Dist.Ct.App.1981)), *review denied*, 634 So.2d 625 (Fla.1994). Thus, the first element of the *Albrecht* test is satisfied.

2. Identity of Parties and Identity of Quality of Parties For or Against Whom the Claim is Made

Next, because each case involves the same parties, namely, Robert V. Nugent, Sr., Marion Nugent, Anuco, and BCT, identity of parties exists. Moreover, identity of "the quality of the person for or against whom the claim is made" exists. The United States Court of Appeals for the Eleventh Circuit (the "Eleventh Circuit") has held that the test for this requirement is "whether the parties in the state action had the incentive to adequately litigate the claims in the same character or capacity as would the parties to the federal action." *McDonald v. Hillsborough County Sch. Bd.*, 821 F.2d 1563, 1566 (11th Cir.1987). In each action, BCT acted in its role as Franchisor under the Franchise Agreement, while Debtors acted in their role as putative Franchisees. Moreover, Debtors do not dispute that they had every incentive to adequately litigate the State Court Action. Indeed, the record reveals that the parties spent over five years litigating the State Court Action before a return of a jury verdict. Thus, the third and fourth elements of the *Albrecht* test are satisfied.

3. Identity of Cause of Action

Next, in determining whether this Adversary Complaint constitutes the same cause of action as the State Court Action, this Court must consider "whether the facts or evidence necessary to maintain the suit are the same in both actions." *Albrecht*, 444 So.2d at 12. *See also Fields v. Sarasota Manatee Airport Auth.*, 953 F.2d 1299, 1308 (11th Cir.1992) ("Florida preclusion law defines identical causes of action as causes sharing 'similarity of facts essential to both actions.'") (quoting *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1509 (11th Cir.), *cert. denied*, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986)); *Brennan*, 915 F.Supp. at 328 ("[T]he principal test for determining whether the causes of action are identical under Florida law 'is whether the primary right and duty are the same in each case. In determining whether the causes of action are the same, a court must compare the substance of the actions, nor their form.'") (quoting *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549 (11th Cir.1986)).

In the State Court Action, BCT sought damages accruing from Debtors' breach of the Franchise Agreement. *See* Complaint. BCT identified the Nugents as "Franchisees" under the Franchise Agreement. *See id.* ¶ 5. In response to this allegation, Debtors responded, "Admitted." See Answer and Affirmative Defenses ¶ 5. Debtors also asserted that BCT had engaged in deceptive and unfair trade practices, misrepresentation, fraud, and unconscionable sales practices. *See id.* Following a trial, the State Court jury returned a unanimous verdict in favor of BCT and awarded damages of $938,000.00. *See id.* ¶ 5. After this Court entered orders lifting the automatic stay, the State Court entered a judgment against Debtors. *See* Final Judgment.

Now, Debtors assert three claims. *See* Adversary Complaint. In Count I of their Adversary Complaint, Debtors seek a determination that "[Debtors] are not personally liable to BCT as franchisees under the Franchise Agreement." *Id.* ¶¶ 21–25. Debtors allege that "[b]y signing the Franchise Agreement in their capacities as nominal officers of Anuco, [Debtors] cannot be personally liable to BCT under the Franchise Agreement." *Id.* ¶ 25.

In Count II of their Adversary Complaint, Debtors seek a determination "that, if BCT claims that [Debtors] are franchisees along with Anuco, or that [Debtors] are somehow guarantors of Anuco's obligations under the Franchise Agreement,

the Franchise Agreement is void as to [Debtors]." *Id.* ¶¶ 26–28. Debtors allege, specifically, that "the Franchise Agreement is void as to [Debtors] because it was materially altered by BCT and Anuco without [Debtors] explicit or informed consent." *Id.* ¶ 28.

In Count III of their Adversary Complaint, Debtors object to BCT's claim for royalty fees allegedly due under the Franchise Agreement. *See id.* ¶¶ 29–33. They seek a determination that "any liability of [Debtors] for unpaid royalty fees under the Franchise Agreement would include liability only for unpaid royalty fees that accrued prior to the July 14, 1991 termination date of the Franchise Agreement." *See id.* They allege, specifically, that "[t]he term of the Franchise Agreement ended in May 1991 when BCT ceased operating as a BCT Franchise under the Franchise Agreement," and therefore, that "no royalty fees are owed under the Franchise Agreement for any period after the term of the Franchise Agreement ended in May 1991." *Id.* ¶¶ 31, 33. Debtors request that this Court "allow [Debtors] to prosecute this adversary proceeding, hearing all relevant evidence as to [Debtors'] alleged liability and damages under the Franchise Agreement, and ultimately determine whether or not BCT's claim for such damages will be allowed, and if so, in what amount." Nugents' Summary Judgment Brief at 16.

Because each proceeding concerns the same transaction or occurrence, namely, the execution and subsequent breach of the Franchise Agreement, the State Court Action and this action share the same operative facts and evidence. In fact, all of the facts giving rise to this action, namely, the execution of the Franchise Agreement, BCT's alleged "material alteration" of the agreement, and Anuco's purported cessa-

tion of operation as a Franchisee under that agreement, existed prior to the filing of the State Court Action. Therefore, although the record does not reveal that the parties litigated the issue in Count II, namely, whether BCT "materially altered" the Franchise Agreement, or the issue in Count III, namely, whether the Franchise Agreement terminated in May 1991, Debtors could have introduced these issues in the State Court Action.[2] *See* Adversary Complaint ¶¶ 26–33.

 Indeed, the Supreme Court of Florida has adopted a "rule against splitting causes of action, which flows from the doctrine of res judicata." *Dep't. of Agric. and Consumer Serv. v. Mid–Florida Growers, Inc.*, 570 So.2d 892, 901 (Fla. 1990). The *Mid–Florida* Court asserted that "[t]he rule against splitting causes of action makes it incumbent upon plaintiffs to raise all available claims involving the same circumstances in one action." *Id.* The court also explained that the rule "is predicated on the following basic policy considerations: (1) finality in court cases promotes stability in the law; (2) multiple lawsuits arising out of a single incident are costly to litigants and an inefficient use of judicial resources; and (3) multiple lawsuits cause substantial delay in the final resolution of disputes." *Id.* (citing *Stanley Builders, Inc. v. Nacron*, 238 So.2d 606 (Fla.1970)). *See also Florida Patient's*, 535 So.2d at 338 ("One cannot revisit the same transaction or occurrence, already adjudicated between the same parties, by resort to a new legal theory in a separate lawsuit. To do so, is an impermissible splitting of causes of action."); *Signo v. Florida Farm Bureau Cas. Ins. Co.*, 454 So.2d 3, 5 (Fla.Dist.Ct.App.1984) ("From one episode or transaction one cause of

2. With regard to the issue in Count I, namely, whether Debtors constitute Franchisees under the Franchise Agreement, the Court notes that BCT raised in the State Court Action the issue of Debtors' roles as Franchisees under the Franchise Agreement. BCT asserted, in Gen-

eral Allegation ¶ 5 of its Complaint, that "[Debtors] are the Franchisees under said Franchise Agreement," to which Debtors, in answering this allegation, responded: "Admitted." Complaint ¶ 5; Answer ¶ 5.

action emerges, though different theories of liability may exist.").

Pursuant to this rule, and the attendant policy considerations, the Court finds that Debtors, in failing to raise in the State Court Action all available claims arising from the execution and breach of the Franchise Agreement, including those issues and legal theories cited in Counts II and III of the Adversary Complaint, and in attempting to raise them now, impermissibly split causes of action, and finds that Debtors *should* have introduced these issues and theories in the State Court Action.

In addition, Florida Rule of Civil Procedure 1.170(a) provides in relevant part that "[a] pleading *shall* state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, provided it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties over whom the court cannot acquire jurisdiction." Fla. R. Civ. P. 1.170(a) (emphasis added). In interpreting this rule, the Supreme Court of Florida has stated that:

[a] compulsory counterclaim is "a defendant's cause of action arising out of the transaction or occurrence that formed the subject matter of the plaintiff's claim." Failure to raise a compulsory counterclaim in the first suit will result in a waiver of that claim.

The purpose of the compulsory counterclaim is to promote judicial efficiency by requiring defendants to raise claims arising from the same "transaction or occurrence" as the plaintiff's claim.... [T]he courts have defined "transaction or occurrence" with a "broad realistic interpretation" in order to avoid numerous lawsuits from the same facts.

*Londono v. Turkey Creek, Inc.*, 609 So.2d 14, 19 (Fla.1992) (citations omitted).

It added that:

[t]he Third District Court of Appeal ... [has] determined that the court [considering whether a claim is compulsory] should focus on whether a logical relationship existed between the claim and the counterclaim.

... [T]he logical relationship test is the yardstick for measuring whether a claim is compulsory....

[A] claim has a logical relationship to the original claim if it arises out of the same aggregate of operative facts as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis of both claims; or (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant.

Like the district court ... we adopt this test in determining whether a claim is compulsory.

*Id.* at 19–20 (citations omitted).

Here, Debtors, in answering and counterclaiming in response to the State Court Action, asserted that BCT had engaged in deceptive and unfair trade practices, misrepresentation, fraud, and unconscionable sales practices. *See* Answer and Affirmative Defenses. Debtors failed, however, to allege in that response that they do not constitute Franchisees under the Franchise Agreement, that BCT had materially altered the Franchise Agreement, or that the agreement had terminated in May 1991. *See id.* Because the same aggregate of operative facts serves as the basis of both this action, in which Debtors introduces these claims, and the State Court Action, a logical relationship exists between the claims in each action. Thus, Debtors' claims, for the purposes of Fla. R. Civ. P. 1.170(a), constituted compulsory claims at the time in which Debtors filed their Answer in the State Court Action. Having failed to raise such claims at that time, Debtors have waived their right to raise them now.

Therefore, the Court, in considering the facts and the evidence necessary to maintain this action, as well as the substance, and not merely the form of the actions, finds that the Adversary Complaint constitutes the same cause of action as that litigated previously.

### 4. Disposal on the Merits

Finally, because the State Court, following trial before a jury, entered a final judgment in BCT's favor on the issue of Debtors' breach of the Franchise Agreement, this Court finds that "the original claim [was] disposed of on the merits," and not on mere technical or procedural grounds. *See Florida Patient's*, 535 So.2d at 336. Debtors emphasize, nevertheless, that the orders lifting the automatic stay preserved their right to object to BCT's claim, and argue, as a result, that the Court cannot accord preclusive effect to the State Court Judgment. *See* Nugents' Summary Judgment Brief at 19. Debtors cite *In re Dalton*, 183 B.R. 127 (Bankr. S.D.Tex.1995) (finding that state court, by entering personal judgment against debtor, exceeded scope of bankruptcy order permitting condominium association to pursue only debtors' personal property) and *In re McCoy*, 163 B.R. 206 (Bankr. M.D.Fla.1994) (finding that bankruptcy court order allowing creditor to proceed in district court against collateral only did not prevent creditor, under doctrine of res judicata, from proving total amount that debtors owed on loan secured by that collateral). *See id.* at 19–20.

■ Here, the stay relief orders do *not* prohibit the application of res judicata, or the Court's allowance of BCT's claim. Moreover, contrary to Debtors' suggestion,

the Court need not have specified in the orders that "once the judgment was obtained, [they] would have preclusive effect." *See id.* at 20. Rather, the orders specify that the grant of stay relief "is without prejudice to the Debtors' right to object to the claim of BCT." Order Granting Limited Relief From Automatic Stay; Order Granting BCT's Motion Pursuant to Section 362(d)(1). The Court has not deprived Debtors of their right to object to BCT's claim. In fact, Debtors have filed motions requesting the estimation of BCT's claim, and the Court addresses them *infra*. Having filed such motions regarding BCT's claim, Debtors cannot successfully argue that the Court, by according preclusive effect to the State Court Judgment, violates or exceeds the terms of its own stay relief orders. Thus, their argument fails.

■ The Court also recognizes that, under Florida law, Debtors' appeal does not affect the finality of the State Court Judgment for the purposes of the application of res judicata. *See Jaffree v. Wallace*, 837 F.2d 1461, 1467 (11th Cir.1988) ("The established rule in the federal courts is that a final judgment retains all of its res judicata consequences pending decision of the appeal."); *Norris Grain Co. v. Transworld Foods, Inc. (In re Transworld Foods, Inc.)*, 41 B.R. 363, 365 (Bankr. M.D.Fla.1984) ("[T]he rule in Florida is that the fact that an appeal is taken bars the res judicata effect of a prior judgment only if the appellate body is to conduct a de novo fact-finding procedure and not where review is on the record. Generally, the Circuit Court in Florida has no authority to grant a trial do novo in exercising its appellate jurisdiction.").[3]

---

**3.** Debtors cite *Jaffree* for the proposition that "res judicata does not apply where 'a substantial change in the underlying facts or law has transpired.'" Nugents' Letter ("Nugents" Letter) dated September 14, 1998 (quoting *Jaffree*, 837 F.2d at 1469). *See also* Anuco's Letter ("Anuco's Letter") Dated September 14, 1998 (citing *Jaffree*). Debtors argue that Anuco's rejection of the Franchise Agreement

constitutes "a substantial change in the underlying facts" and hence, that this Court must not apply res judicata in this case. *See* Nugents' Letter ("Once the Nugents filed for bankruptcy and the franchise agreement was thereafter rejected (both of which occurred prior to the entry of BCT's judgment), a new set of operative facts and governing law was implicated."); Anuco's Letter ("Any Florida

#### 5. Conclusion

Accordingly, because the requisite identities exist in this case, the Court finds that summary judgment on Debtors' Adversary Complaint is warranted on the grounds of res judicata. Indeed, because res judicata applies in this case, the State Court's ruling, that Debtors owe damages resulting from their breach of the Franchise Agreement, necessarily includes a determination that: (1) the Nugents constitute Franchisees under the Franchise Agreement; (2) the Franchise Agreement is *not* void; and (3) that Debtors' liability for royalty fees under the Franchise Agreement did *not* terminate as of May 1991. Anuco's rejection of the Franchise Agreement does not compel a different result. *See* discussion *infra* at 39.

In so finding, the Court notes that the *Albrecht* Court held that "[t]he general principle behind the doctrine of res judicata is that a final judgment by a court of competent jurisdiction is absolute and puts to rest every justiciable, as well as every actually litigated, issue." *Albrecht,* 444 So.2d at 11–12. The Court also notes the Eleventh Circuit's observation in *Precision Air Parts, Inc. v. Avco Corp.,* 736 F.2d 1499, 1503 n. 4 (11th Cir.) (citing *Southwest Airlines Co. v. Texas International Airlines,* 546 F.2d 84, 94 (5th Cir.), *cert. denied,* 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977)), *reh'g denied,* 744 F.2d 97 (11th Cir.1984), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 966, 83 L.Ed.2d 970 (1985):

> By declaring an end to litigation, the doctrine adds certainty and stability to social institutions. This certainty in turn generates public respect for the courts. By preventing relitigation of issues, res judicata conserves judicial time and resources. It also supports several private interests, including avoidance of substantial litigation expenses, protection from harassment or coercion by lawsuit, and avoidance of conflicting rights and duties from inconsistent judgments.

BCT, having litigated this cause of action, is entitled to rely upon the State Court Action for preclusive effect. To deny preclusive effect in this case would reward Debtors for not fully and vigorously litigating in the State Court Action the issues arising from the execution and breach of the Franchise Agreement, and could foster, in contravention of the Florida Supreme Court's holding in *Mid–Florida* and the Eleventh Circuit's holding in *Avco,* negative effects such as costly multiple lawsuits, instability in the law, lack of public respect for the courts, inefficient use of judicial time and resources, substantial delay in the final resolution of disputes, the use of harassment or coercion by lawsuit, and avoidance of conflicting rights and duties resulting from inconsistent judgments. *See Mid–Florida,* 570 So.2d at 901; *Avco,* 736 F.2d at 1503.

#### C. Collateral Estoppel and Entire Controversy

BCT also argues that the collateral estoppel and entire controversy doctrines

---

appeal court would find would find itself in confusion about the bankruptcy issues of rejection and other legal issues ... and the impact on the jury verdict."). The Court granted relief from the automatic stay, however, only for the purpose of allowing the State Court to enter judgment in the State Court Action. *See* Order Granting Limited Relief From Automatic Stay ("The Motion is hereby granted for the limited purpose of modifying the automatic stay to permit BCT to proceed to enter final judgment in the Florida Action including the fixing of costs, legal fees, and pre-judgment interest...."); Order Granting BCT's Motion Pursuant to Section 362(d)(1) ("[T]he action ... may proceed so that the Florida court may fix counsel fees, costs, and pre-judgment interest and enter final judgment."). Moreover, the State Court based its entry of the State Court Judgment on the jury verdict alone. *See* Final Judgment ("This Cause having been tried to a jury commencing February 3, 1997, the jury having rendered a verdict on February 10, 1997, and the Court having denied the defendants' motions for new trial, pursuant to the verdict rendered in this action on February 10, 1997...."). Rejection of the Franchise Agreement was *not* at issue. Thus, for the purpose of according res judicata effect to the State Court Judgment, the rejection does not constitute a "substantial change."

bar litigation of Debtors' claims. *See* BCT's Summary Judgment Brief at 12–20.

### 1. Collateral Estoppel

■ "Issue preclusion, also known as collateral estoppel, bars relitigation of issues adjudicated in a prior action." *Swineford v. Snyder County Pennsylvania*, 15 F.3d 1258, 1266 (3d Cir.1994) (citing *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1074 (3d Cir.1990)).

■ The Third Circuit requires bankruptcy courts, in determining whether to apply collateral estoppel to a state court judgment, to review the entire record of the state court's trial. *See In re Ross*, 602 F.2d 604, 608 (3d Cir.1979). The *Ross* Court stated that "[a] determination of whether [the elements of collateral estoppel] are met should be made in the first instance by the bankruptcy judge after a careful review of the record of the prior case, a hearing at which the parties have the opportunity to offer evidence, and the making of findings of fact and conclusions of law." *Id.* In considering whether to apply the doctrine to a particular issue, the court asserted that "[s]uch a determination requires a full examination of the trial and appellate record in the prior case...." *Id.*

■ Here, in attempting to assemble a record of the State Court Action, the parties provided copies of only BCT's Complaint, Debtors' Answer and Affirmative Defenses, the Final Judgment, and the State Court's judgment awarding attorneys' fees and costs. Although the Answer refers to a "Counterclaim," the parties failed to provide a copy of this document. *See id.* Because Debtors admitted, in their Answer, that they constitute "Franchisees" under the Franchise Agreement, the Court finds that the parties may have litigated the issue of Debtors' status as Franchisees. The aforementioned documents do not indicate, however, whether the parties actually litigated the issue of whether BCT material-ly altered the Franchise Agreement, or the issue of whether the agreement terminated in May 1991. Thus, not having a complete record of which to conduct a careful review, the Court declines to apply collateral estoppel.

### 2. Entire Controversy

■ This Court has defined the entire controversy doctrine as "a claim preclusion rule requiring that a litigant assert all related claims against all parties in one action or be precluded from bringing a second action." *Paterson v. Scherer (In re Hudsar Inc.)*, 199 B.R. 266, 277 (Bankr. D.N.J.1996). New Jersey Court Rule 4:30A codifies the doctrine. *See R.* 4:30A ("Non-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine....").

As stated, however, this Court, in determining the preclusive effect of the State Court Action, applies Florida law. *See* discussion *supra* at 22–23. Therefore, the entire controversy doctrine, as developed under New Jersey law, does not apply. At any rate, this Court does cite, in support of its application of res judicata, Florida's rule against splitting of causes of action. *See* discussion *supra* at 25. That rule bears similarities to the entire controversy doctrine. *See id.*

### D. Rooker–Feldman Doctrine

■ BCT argues that the Rooker–Feldman doctrine "bars [Debtors] from using this ... Court as a forum for [airing] their grievances with the [State Court Judgment]." *See* BCT's Summary Judgment Brief at 16.

In arguing that the Rooker–Feldman doctrine does not apply, Debtors emphasize that this Court, as a result of Anuco's rejection of the Franchise Agreement, *must* make a determination of BCT's claim pursuant to § 365(g) and § 502. *See* Nugents' Summary Judgment Brief at 25. Debtors argue that the Court, in making

this determination, is merely "fulfilling its obligations under the Bankruptcy Code" and is "not acting as an appellate court with respect to the Florida judgments." *Id.* Debtors also emphasize that, because the orders lifting the automatic stay expressly reserve Debtors right to object to BCT's claim, "the Court should not now be precluded from enforcing the conditions pursuant to which BCT's judgment was obtained." *Id.* Finally, they argue that BCT, by submitting a claim, has "submitted itself and its claim to the equitable power of [this Court]." *Id.* at 26.

The Third Circuit recently held that:

> [u]nder the Rooker–Feldman doctrine, "federal district courts lack subject matter jurisdiction to review final adjudications of a state's highest court or to evaluate constitutional claims that are 'inextricably linked with the state court's [decision] in a judicial proceeding.'" *Blake v. Papadakos,* 953 F.2d 68, 71 (3d Cir.1992) (quoting *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 483 n. 16, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)). The concerns that underlie the doctrine are respect for the state courts and concerns over finality of judgments. *See Guarino v. Larsen,* 11 F.3d 1151, 1156–57 (3d Cir.1993). District courts lack subject matter jurisdiction once a state court has adjudicated an issue because Congress has conferred original jurisdiction, not appellate jurisdiction, on the district courts. We have interpreted the doctrine to encompass final decisions of lower state courts. *See FOCUS v. Allegheny County Court of Common Pleas,* 75 F.3d 834, 840 (3d Cir.1996).

*In re Gen. Motors Corp.,* 134 F.3d 133, 143 (3d Cir.1998) (citations omitted). *See also E.B. v. Verniero,* 119 F.3d 1077, 1091–92 (3d Cir.1997) ("If a litigant resorts to a state court and suffers an adverse judgment, a lower federal court must respect that judgment unless and until it is overturned. The litigant's only remedy is by way of appeal through the state court system and by way of petition to the Supreme Court of the United States thereafter."), *reh'g denied,* 127 F.3d 298 (3d Cir.1997).

The *Gen. Motors* Court addressed a case in which certain class action members had sought to enjoin further proceedings in their class action, then in a Louisiana state court. *See id.* at 137. The district court denied relief. *See id.* After the class members filed an appeal, the Louisiana state court entered final judgment on a settlement agreement in the case. *See id.* In determining whether the Rooker–Feldman doctrine barred its review of the district court's ruling, the Third Circuit found that:

> the Louisiana court has entered a valid final judgment. The decision by the Court was clearly an adjudicative and not a legislative or ministerial act. Therefore, in order for us to grant [the class members'] relief, we would first have to "determine that the state court judgment was erroneously entered." *FOCUS,* 75 F.3d at 840. Rooker–Feldman bars exactly this sort of intermediate appellate review of state court judgments and divests this Court of subject matter jurisdiction of this appeal.

*Id.* at 143 (citations omitted). *See also FOCUS,* 75 F.3d at 840 ("When a plaintiff seeks to litigate a claim in a federal court, the existence of a state court judgment in another case bars the federal proceeding under Rooker–Feldman only when entertaining the federal court claim would be the equivalent of an appellate review of that order. For that reason, Rooker–Feldman applies only when in order to grant the federal plaintiff the relief sought, the federal court must determine that the state court judgment was erroneously entered or must take action that would render that judgment ineffectual.").

In *Baldino v. Wilson (In re Wilson),* 116 F.3d 87 (3d Cir.1997), the Third Circuit addressed the Rooker–Feldman doctrine in the context of a bankruptcy case. In *Wilson,* a party moved for relief from the automatic stay in order to appeal an ad-

verse ruling in her state court malicious prosecution action against a Chapter 7 debtor. *See id.* at 89. The bankruptcy court and then the district court denied the motion. *See id.* The Third Circuit, however, found that cause to lift the automatic stay existed under § 362(d)(1). *See id.* at 90. It noted that the doctrine of issue preclusion, in the absence of relief from the automatic stay, would prevent the appellant from relitigating the malicious prosecution issue in the bankruptcy court, and hence, that a denial of such relief would prevent her from challenging the adverse judgment before the completion of the bankruptcy proceeding. *See id.* In granting relief from the automatic stay, the Third Circuit also noted that:

> [t]he bankruptcy court is also prohibited from reviewing the state court's judgment by the Rooker–Feldman doctrine, which prohibits lower federal courts from sitting as effective courts of appeal for state court judgments. *See, e.g., D.C. Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) (citing *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923)); *Besing v. Hawthorne (In re Besing),* 981 F.2d 1488, 1496 (5th Cir. 1993) ("The Bankruptcy Code was not intended to give litigants a second chance to challenge a state court judgment nor did it intend for the Bankruptcy Court to serve as an appellate court [for state court proceedings]") (quoting *In re G & R Mfg. Co.,* 91 B.R. 991, 994 (Bankr.M.D.Fla.1988)).

*Id.* at 90.

In this case, the State Court has entered a valid final judgment against Debtors on the issue of their liability under the Franchise Agreement. *See* Final Judgment. Further, like the Louisiana state court's judgment in *Gen. Motors,* the State Court Judgment constitutes an adjudicative act, and not merely a legislative or ministerial act. Nevertheless, Debtors now seek to raise again the issue of their liability under the Franchise Agreement. *See* Adversary Complaint. Under these circumstances, entertainment of Debtors' claims would constitute the equivalent of an appellate review of the State Court Judgment. Indeed, in order to address Debtors' claims, this Court would first have to determine that the State Court erroneously entered the State Court Judgment. According to the Third Circuit, "Rooker–Feldman bars exactly this sort of intermediate appellate review of state court judgments." *Gen. Motors,* 134 F.3d at 143. Here, Debtors are free to relitigate the State Court Judgment in the Florida Court of Appeal. In fact, they have already filed an appeal of the judgment. *See* Notice of Motion. Thus, the Rooker–Feldman doctrine imposes an additional barrier to relitigation of the State Court Action in this Court.

**E. Equitable Power**

■ Debtors argue that this Court can exercise its equitable power to set aside the State Court Judgment. *See* Nugents' Summary Judgment Brief at 15. Debtors cite *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) for the proposition that "[the Court's] review includes 'full power to inquire into the validity of any claim asserted against the estate and to disallow it if its is ascertained to be without lawful existence.'" *Id.* (quoting *Pepper,* 308 U.S. at 305, 60 S.Ct. 238). They also cite *Margolis v. Nazareth Fair Grounds & Farmers Mkt.,* 249 F.2d 221 (2d Cir.1957) for the proposition that "[t]o the extent that equitable principles require reexamination by the bankruptcy court of the bases for the judgment where these bases have been or could have been previously adjudicated the doctrine of res judicata is inapplicable in bankruptcy proceedings." *Id.* at 16 (quoting *Margolis,* 249 F.2d at 224). On these bases, Debtors argue that "the facts and equities compel [the Court] to exercise its equitable powers to 'look behind' BCT's judgment to resolve BCT's claim." *Id.* at 16.

Debtors' argument fails. The *Margolis* Court specified that such equitable princi-

ples exist in cases in which "[the judgment] was obtained by collusion of the parties or is founded upon no real debt." *Margolis,* 249 F.2d at 224 (quoting *Pepper,* 308 U.S. at 306, 60 S.Ct. 238). In applying this rule, the *Margolis* Court allowed collateral attack on certain judgments "on the ground that they were fraudulently obtained and not founded on any legally enforceable obligation." *Id. See generally In re Farrell,* 27 B.R. 241, 245 (Bankr. E.D.N.Y.1982) ("The Second Circuit in *Margolis* ... held that in a bankruptcy proceeding where equitable principles require reexamination of the basis for the judgment, res judicata becomes inapplicable to the proceeding. These equitable principles exist according to the court in *Margolis* where the claim upon which the judgment is based is without lawful existence, or the judgment was fraudulently obtained.") (citation omitted).

Moreover, in *Heiser v. Woodruff,* 327 U.S. 726, 736–37, 66 S.Ct. 853, 90 L.Ed. 970, *reh'g denied,* 328 U.S. 879, 66 S.Ct. 1335, 90 L.Ed. 1647 (1946), the Supreme Court asserted that:

> [u]ndoubtedly since the bankruptcy act authorizes a proof of claim based on a judgment, such proof may be assailed in the bankruptcy court on the ground that the purported judgment is not a judgment because of want of jurisdiction of the court that rendered it over the persons of the parties or the subject matter of the suit, or because it was procured by fraud of a party. But it is quite another matter to say that the bankruptcy court may reexamine the issues determined by the judgment itself. It has from an early date, been held to the contrary....
>
> > *Pepper v. Litton* [does not] sustain the contention that the bankruptcy court in passing on the validity of creditors' claims, may disregard the principle of res judicata.

Thus, in the absence of an allegation of fraud, collusion, or lack of jurisdiction, courts have accorded preclusive effect to state court judgments. For instance, in *Kelleran v. Andrijevic,* 825 F.2d 692 (2d Cir.1987), *cert. denied,* 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988), the United States Court of Appeals for the Second Circuit addressed a case in which a creditor sought to enforce a state court default judgment against the debtor. The debtor failed to allege that the creditor had procured the judgment by either collusion, fraud, or a lack of jurisdiction. *See id.* at 694. The court stated that "[t]his appeal presents the issue whether the bankruptcy court's equitable powers permit it to disregard the preclusive effect of a state court default judgment where the judgment was obtained by a creditor without fraud or collusion...." *Id.* The bankruptcy court found that the creditor's claim "[was] wholly without merit," and refused to give the state court default judgment binding effect. *Id.* The district court affirmed the bankruptcy court's finding. *See id.*

After noting that "the bankruptcy court ... was bound to give preclusive effect to the default judgment obtained in the state court ... to the same extent as would a New York court," and that, under New York law, a defaulting party may not contest liability issues, the *Kelleran* Court found that "[t]he bankruptcy court, therefore, was bound to the liability determinations in the state judgment unless an exception existed to prevent operation of the judgment's preclusive effect" and that "Bankruptcy courts may look beyond a state court default judgment where the judgment was procured by collusion or fraud, *Margolis v. Nazareth Fair Grounds & Farmers Market,* 249 F.2d 221, 223–25 (2d Cir.1957), or where the rendering court lacked jurisdiction, *Heiser v. Woodruff,* 327 U.S. 726, 736, 66 S.Ct. 853, 90 L.Ed. 970 (1946)." *Id.* (citation omitted).

The court added that:

*Margolis* and its progeny speak only to the bankruptcy court's broad equitable power to remedy fraudulent procurement of default judgments. The *Margolis* line does not alter [28 U.S.C. § ]

1738's requirement that bankruptcy courts respect lawfully obtained state court judgments. [The debtor] concedes that the only established exceptions to this rule are not applicable in this case. While the record strongly suggests that the merits of [the creditor's] claims are doubtful, [the debtor] should have attacked these claims in the state court. Bankruptcy proceedings may not be used to re-litigate issues already resolved in a court of competent jurisdiction. The courts below erred in refusing to give preclusive effect to the state court judgment.

*Id.* at 695 (citation omitted).

On these grounds, the *Kelleran* Court reversed the district court's judgment. *See id.* Other United States Courts of Appeal have reached the same result in similar cases. *See In re Bulic,* 997 F.2d 299, 305 (7th Cir.1993) (precluding debtors from challenging validity of judgment creditor's claims, where debtors had failed to allege lack of state court jurisdiction or fraud); *Johnson v. Laing (In re Laing),* 945 F.2d 354, 357 (10th Cir.1991) (according preclusive effect to state court judgment where fraud and lack of jurisdiction exceptions were not applicable); *Browning v. Navarro,* 887 F.2d 553, 563 (5th Cir. 1989) ("Other than lack of jurisdiction or fraud, there are no other federal grounds which nullify a state court judgment."), *reh'g denied,* 894 F.2d 99 (5th Cir.1990); *Boyajian v. DeFusco (In re Giorgio),* 862 F.2d 933, 937 (1st Cir.1988) ("[W]e do not understand [*Pepper* ] to suggest that a bankruptcy court can permit a state claim in the face of state authority indicating that no such claim exists, nor does it hold that a bankruptcy court can ignore the state's own law of res judicata."). *See also Lewison,* 162 B.R. at 983–84 (applying res judicata to claims related to earlier foreclosure action in state court).

Likewise, here, a Florida court would accord preclusive effect to the State Court Judgment. *See* discussion *supra* at 28. Moreover, Debtors have not alleged, nor does the record reveal, that the State Court lacked jurisdiction over the subject matter or parties, or that BCT procured the State Court Judgment by fraud or collusion. Thus, this Court must accord preclusive effect to the State Court Judgment. Again, to the extent that Debtors find fault with the State Court's judgment, they may seek redress in the Florida Court of Appeal.

## II. Claim Estimation Motions

Anuco and the Nugents have filed separate motions for the entry of an order providing for the estimation and determination of BCT's claim pursuant to § 502(c).

Anuco filed its motion for estimation prior to the entry of the State Court Judgment. It alleges that the State Court jury's award "is meant to compensate BCT for royalties through the year 2013." Anuco's Brief in Support of Cross–Motion to Estimate Claim of BCT ("Anuco's Estimation Brief") at 12–13. Anuco further alleges that its rejection of the Franchise Agreement "is obviously an event that transpired after the Florida jury's award against [Anuco] and substantially impacts upon BCT's claim and award." *Id.* at 12. Anuco therefore requests that the Court "now estimate BCT's claim against [Anuco] and let BCT prove the amount really due and owing under the [Franchise ] Agreement." Application in Support of Cross–Motion For Estimation of Claim ¶ 12.

The Nugents argue that § 365 and § 502 exclusively govern BCT's claim for damages under the Franchise Agreement, as a result of Anuco's rejection of the Franchise Agreement. *See* Nugents' Memorandum of Law Regarding Estimation of Claim ("Nugents' Estimation Brief") at 1. They allege that the rejection "completely altered the basis for calculating damages which previously applied when a Florida jury returned a verdict pre-petition," and consequently, that "the amount of the jury verdict, which projects damages into the year 2013, and the final

judgment based upon it, is no longer valid." *Id.* Accordingly, the Nugents request that the Court reduce the amount of BCT's claim to reflect the rejection date of the Franchise Agreement. *See id.* at 10.

In arguing that the Court should not hold them liable for royalty fees accruing after the rejection date, the Nugents emphasize that Anuco "has been unable to use, and has not used [as of the rejection date], BCT's trademarks, trade names, and/or [the] BCT System from which would generate any and all royalty fees." *Id.* They argue, further, that "[i]n fact, because Anuco ceased operating as a BCT franchise and using BCT's trademarks, trade names and [the] BCT System in June 1991 ... royalty fees can only be owed through June 1991, i.e., for a period of approximately three years." *Id.*

The Nugents also maintain that the Court should exclude from BCT's claim the State Court's award of legal fees, expenses, and interest. *See id.* at 1. They allege that such fees and costs "have absolutely no connection to BCT's claim for rejection damages in this Chapter 11 case." *Id.*

Accordingly, Debtors request that this Court enter an order estimating that BCT has an unsecured claim for royalty fees accruing until, at the latest, June 1991. *See id.* at 10.

BCT argues, first, that its claim is neither contingent nor unliquidated, and hence, that Debtors are not entitled to an estimation of BCT's claim under § 502(c). *See* BCT's Memorandum of Law in Opposition to Debtors' Motion to Estimate Claim ("BCT's Estimation Brief") at 10–12.

BCT argues, second, that the Rooker–Feldman, res judicata, and collateral estoppel doctrines bar Debtors' estimation motions. *See id.* at 12–17.

BCT argues, third, that its claim is based not upon the rejection of the Franchise Agreement, but rather, upon Debtors' pre-petition breach of the Franchise Agreement. *See id.* at 18–20.

BCT argues, fourth, that only Anuco moved to reject the Franchise Agreement, and that, as a consequence, the Nugents cannot derive the benefits, if any, from the rejection. *See id.* at 21.

## A. Rooker–Feldman

In *Audre, Inc. v. Casey (In re Audre, Inc.)*, 216 B.R. 19 (9th Cir. BAP 1997), the United States Bankruptcy Appellate Panel of the Ninth Circuit addressed a similar case. There, creditors had filed proofs of claim against a debtor company based upon an $11.5 million state court judgment. *See id.* at 23. The debtors, the company and its wholly-owned subsidiary, moved to have the claims disallowed, on the grounds that the state court did not have subject matter jurisdiction, or alternatively, to have the claims estimated at $0. *See id.* at 23–24. With respect to the company, the bankruptcy court found that, *inter alia*, the Rooker–Feldman doctrine precluded collateral attack on the State Court Judgment. *See id.* at 24.

The appellate panel affirmed that finding. *See id.* at 26. The court noted that "[t]he Rooker–Feldman doctrine ... provides that a federal district court lacks the jurisdiction to hear a collateral attack on a state court judgment or to review final determinations of state court decisions." *Id.* It found that:

[i]f a federal bankruptcy court were to intervene in a state court judgment, it could only do so if the state proceedings were void ab initio; a void judgment being one which from its inception was a complete nullity and without legal effect. *In re James*, 940 F.2d 46, 52 (3d Cir. 1991). The *James* court correctly noted that in the interest of finality, the concept of void judgments is to be narrowly construed. *Id.* In fact, the Rooker–Feldman doctrine applies even where a state court judgment may be in error. In the instant case, the [state] court judgment was not a complete nullity and

without legal effect. Until it is reversed by the California court of appeals, for the purposes of the Rooker–Feldman doctrine, it is a valid final judgment.

Based on the foregoing reasons, we conclude that the Rooker–Feldman doctrine precludes the bankruptcy court from disallowing [the creditors'] claims against [the company] based on the [state court] judgment.

*Id.* at 29–30 (citation omitted).

In support of its finding, the *Audre* Court cited *In re Keenan,* 201 B.R. 263 (Bankr.S.D.Cal.1996). In that case, a Chapter 11 debtor had requested estimation of a creditor's claim arising from a pre-petition state court judgment. *See id.* at 264. Before filing his petition, the debtor had filed an appeal of the judgment. *See id.* In arguing in favor of estimation, the debtor argued that the determination of the creditor's claim through the state court appellate process would "unnecessarily delay reorganization." *Id.*

The *Keenan* Court held, however, that:

debtor asserts he is not attacking the state court judgment, and that its validity will be determined on appeal in the state courts. Yet he wants the state court judgment to be ignored, and for this Court to estimate under state law what a state court or jury would find the claim was worth, so that the debtor can confirm a plan to provide for allowed claims, and to receive a discharge as to all other claims, or portions of claims not paid through the plan. [The creditor] is the major creditor in this case, and if her claim is allowed in an amount even approximating the amount of the judgment, debtor has insufficient assets to pay it. In this Court's view, debtor's argument is disingenuous. Debtor really is seeking to have a second try at his defense to the state case. He wants this Court to substitute its judgment for the judgment already reached by a state court jury and judge. The Rooker–

Feldman doctrine precludes such a result.
*Id.* at 267.

■ Similarly, in this case, BCT has filed proofs of claim based on a state court judgment. The State Court Judgment, like the judgment in *Audre,* "was not a complete nullity and without legal effect." *Audre,* 216 B.R. at 29. Nonetheless, Debtors seek an estimation of BCT's claim. As the *Audre* Court noted, however, "[t]he Rooker–Feldman doctrine ... provides that a federal district court lacks the jurisdiction to hear a collateral attack on a state court judgment or to review final determinations of state court decisions." *Id.* at 26. In similar cases, the *Audre* Court and the *Keenan* Court found that the Rooker–Feldman doctrine precludes the estimation of a claim based on a state court judgment. *See id.* at 29–30. *See also Keenan,* 201 B.R. at 267. The Court finds that Debtors, like the debtor in *Keenan,* "[are] really ... seeking to have a second try at [their] defense to the state case" and "to substitute [this Court's] judgment for the judgment already reached by a state court jury and judge." *Keenan,* 201 B.R. at 267. Accordingly, because BCT's claim is based on a state court judgment, the Rooker–Feldman doctrine precludes this Court from applying § 502(c).

**B. § 502(c)**

■ Section 502(c)(1) provides in part that "[t]here shall be estimated for purpose of allowance under this section ... any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case...." 11 U.S.C. § 502(c)(1) (1998).

In *Bittner v. Borne Chemical Company Inc.,* 691 F.2d 134, 135 (3d Cir.1982), the Third Circuit noted that the Bankruptcy Code and Federal Rules of Bankruptcy Procedure fail to address the manner in which courts must estimate contingent or unliquidated claims pursuant to § 502(c).

Despite a "lack of express direction," the Third Circuit asserted that:

> we are persuaded that Congress intended the procedure to be undertaken initially by the bankruptcy judges, using whatever method is best suited to the particular contingencies at issue. The principal consideration must be an accommodation to the underlying purposes of the Code. It is conceivable that in rare and unusual cases arbitration or even a jury trial on all or some of the issues may be necessary to obtain a reasonably accurate evaluation of the claims. *See* 3 Collier on Bankruptcy P 502.03 (15th ed.1981). Such methods, however, usually will run counter to the efficient administration of the bankrupt's estate and where there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine the value. In so doing, the court is bound by the legal rules which may govern the ultimate value of the claim.

*Id.*

The court in *In re Casey*, 198 B.R. 910 (Bankr.S.D.Cal.1996) addressed a case resembling the one before this Court. There, a state court had reached a tentative decision awarding a party damages against her former husband. *See id.* at 911. The former husband filed a Chapter 11 bankruptcy petition, however, before the state court could enter a judgment. *See id.* The bankruptcy court granted relief from the automatic stay, however, and the state court entered judgment accordingly. *See id.* at 911–12. After the debtor failed to present a confirmable plan, the court issued an order to show cause why it should not reconsider a previous ruling denying certain creditors' motions to dismiss the case. *See id.* at 913.

In defense of his latest plan, the debtor argued that the court could determine whether the plan provided full payment only by analyzing the claims as allowed, not as filed. *See id.* at 915. The debtor characterized the claims as unliquidated,

contingent, and disputed. *See id.* With respect to the former wife's claim, however, the *Casey* Court held that:

> [the debtor] has taken the position since the first appearance in this case, and the timing of the bankruptcy filing suggests it was the design of the filing, that by filing bankruptcy before the family court could enter a judgment on its already announced Tentative Decision, that Decision would be of no force and effect in issue preclusion or otherwise. Debtor has argued that it is contingent and unliquidated, even though it is the product of a non-jury trial over a three week period in 1994. Debtor asserts the same is true even after relief from stay was granted to allow entry of judgment because debtor timely filed a notice of appeal and under California law judgments are not final when an appeal is pending. Consequently, argues the debtor, it is entitled to ask the Court to estimate [the former wife's] claims under 11 U.S.C. § 502(c), or to collaterally attack the state court judgment by use of the claims objection process.
>
> This Court holds that the judgment of the family court is neither contingent nor unliquidated, even though not "final." Therefore, estimation of [the former wife's] claim under § 502 is not permissible.

*Id.* at 916.

On these and other grounds, the *Casey* Court found that the debtor had filed his Chapter 11 petition in bad faith and dismissed the case. *See id.* at 918.

The debtors in *Audre* also moved for estimation of claims pursuant to § 502. *See Audre*, 216 B.R. at 23. They also appealed the adverse state court judgment. *See id.* Noting that applicable state law did not accord preclusive effect to a judgment pending appeal, they argued that the judgment was contingent and unliquidated within the meaning of § 502(c). *See id.* at 30. The bankruptcy court, and later the appellate panel, disagreed. *See*

*id.* at 24. The appellate panel first noted that:

> [r]esorting to § 502(c) is only appropriate when the claim is either contingent or unliquidated. *In re Rhead,* 179 B.R. 169, 172 (Bankr.D.Ariz.1995). If this debt does not fit this definition, estimation is inappropriate. *Id.* The Code does not define the terms contingent or unliquidated but case law has provided some definition of the terms. *In re Nicholes,* 184 B.R. 82, 88 (9th Cir. BAP 1995). It has been found that if all events giving rise to liability occurred prior to the filing of the bankruptcy petition, the claim is not contingent. *Id.; see also In re Fostvedt,* 823 F.2d 305, 306 (9th Cir.1987). The Ninth Circuit Bankruptcy Appellate Panel has held that "whether a debt is liquidated or not ... does not depend strictly on whether the claim sounds in tort or in contract, but whether it is capable of ready computation." *In re Loya,* 123 B.R. 338, 340 (9th Cir. BAP 1991).

*Id.* at 30. *See also Mazzeo v. United States,* 131 F.3d 295, 303–04 (2d Cir.1997) (adopting *Nicholes* Court's definitions of the terms "contingent" and "liquidated"); *O'Neill v. Continental Airlines. Inc. (In re Continental Airlines),* 981 F.2d 1450, 1461 (5th Cir.1993) ("[I]n cases where a claim is neither contingent nor unliquidated, estimation is 'simply inappropriate.' ") (quoting *First City Beaumont v. Durkay (In re Ford),* 967 F.2d 1047, 1053 (5th Cir.1992)).

The court held that:

> [the creditors'] claim[s] in the instant case [are] not contingent just because the [state] court judgment is on appeal. Despite the quirk of California law regarding issue preclusion, the Ninth Circuit has held that a judgment is final for the purposes of the Rooker–Feldman doctrine even if it is on appeal. Further, the actions giving rise to the liability, the instance of fraud [upon which the judgment was based] and the resulting [state court] judgment, both occurred pre-petition and, thus, fall squarely into

the *Fostvedt* definition. Additionally, the amount of the claim is not unliquidated because, as of the date of the filing of the chapter 11 case, it was easily subject to ready determination— the [state] court had already determined the amount of the claim to be $11.5 million. As such, the bankruptcy court correctly stated that even "if § 502(c) were applicable to this case and the court was obligated to estimate the [state court] claim, the court would estimate it in the amount of the state court judgment."

*Id.* at 30–31 (citations omitted).

The *Audre* Court held, therefore, that "as the [state court] judgment is a valid and final judgment for Rooker–Feldman doctrine purposes despite being on appeal, there is both a legal and factual basis for [the debtor company's] liability on the [state court] judgment, and a § 502(c) estimation of the claims would be improper." *Id.* at 30.

The *Keenan* Court also addressed a § 502(c) claim estimation motion. *See Keenan,* 201 B.R. at 264. In addressing the issue of whether the creditor's claim was continent within the meaning of § 502(c), the court noted that "[i]f all events upon which a future definition of liability could be based have occurred prepetition, then the claim is not contingent, even though liability has yet to be fixed." *Id.* at 265. In applying this definition, the court found that "[the creditor's] claim is predicated in smaller part on a breach of contract, and in larger part on claims of fraud," and that "[a]ll of the events upon which liability could be imposed occurred prepetition." The court found, therefore, that the creditor's claim was not contingent and "not amenable to estimation under § 502(c) on that ground." *Id.*

With respect to the issue of whether the claim was unliquidated, the court noted that the *Loya* Court had held that "whether a debt is liquidated or not ... does not depend strictly on whether the claim

sounds in tort or contract, but whether it is capable of ready computation." *Id.* at 266 (quoting *Loya,* 123 B.R., at 340). In applying this definition, the *Keenan* Court found that:

> [i]n the instant case, the major component of [the creditor's] claim sounds in tort. Had the case not proceeded to trial and judgment, it might have been difficult to conclude that the amount of the claim was susceptible to ready determination because of the multiple components of the damages portion of the fraud claims. However, the state court case did proceed to judgment based on a jury verdict, and as of the date of the filing of the bankruptcy was readily calculable. The claim is therefore liquidated.

*Id.*

The court added that:

> [s]ection 502(c) contemplates that a bankruptcy court will estimate a claim that is either contingent or unliquidated if failure to do so would unduly delay administration of the bankruptcy case. Estimation, in turn, contemplates that the bankruptcy court will, in effect, put itself in the place of a nonbankruptcy court or jury to estimate the amount of the debt. In either instance, § 502(c) presupposes that a nonbankruptcy court has not already done so. It would stand comity on its head and misuse the limited scope of § 502(c) for a bankruptcy court to proceed as if a nonbankruptcy court or jury had not acted at all when a case has already proceeded to judgment. Yet that is what the debtor asks this Court to do.

> Because [the creditor's] claim proceeded to judgment in state court, her claim is neither contingent nor unliquidated for purposes of 11 U.S.C. § 502(c). That is so despite the fact that debtor has appealed the judgment, and despite the peculiarity of California law that keeps a judgment non-final for issue preclusion purposes so long as an appeal is pending.

If § 502(c) were applicable to this case, because of the peculiarities of California law or otherwise, it would not change the end result. As stated above, the judgment was reached after a fully adjudicated jury trial. Without conducting a full retrial this Court could not make a more accurate estimate of a claim than took place during the state court trial. This Court would thus estimate the claim in the amount of the judgment, as modified.

*Id.*

The court held, therefore, that the claim was neither contingent nor unliquidated, and not eligible for estimation pursuant to § 502(c). *See id.* at 267. It added that "by enactment of § 502(c), the Congress did not intend to authorize bankruptcy courts to, de facto, conduct an appellate review of a state court judgment, review of which would otherwise violate 28 U.S.C. § 1257 and the Rooker–Feldman doctrine." *Id.*

Similarly, in this case, Debtors seek an estimation of BCT's claim pursuant to § 502. Section 502(c) specifies, however, that a court may only estimate contingent or unliquidated claims. *See* § 502(c). The Court finds that BCT's claim, like the claims in *Audre* and *Keenan,* is neither contingent nor unliquidated. First, the State Court Action arose from Debtors' pre-petition breach of the Franchise Agreement, and the State Court entered a final judgment on the basis of that breach. Second, as noted, Debtors' appeal, under Florida law, does not affect the finality of the State Court Judgment for the purposes of the application of res judicata. *See* discussion *supra* at 28. Thus, as in *Keenan,* "[a]ll of the events upon which liability could be imposed occurred prepetition." *Keenan,* 201 B.R. at 265. Hence, the claim is not contingent.

The Court also notes that BCT's claim, as of the petition filing dates, was capable of ready determination. The State Court, following a five-year discovery period and

a trial, had already determined the amount of BCT's claim against Debtors at that time. As in *Keenan*, "[h]ad the case not proceeded to trial and judgment, it might have been difficult to conclude that the amount of the claim was susceptible to ready determination...." *Id.* at 266. The *Keenan* Court nevertheless emphasized that "the state court case did proceed to judgment *based on a jury verdict,* and as of the date of the filing of the bankruptcy was readily calculable." *Id.* (emphasis added). Again, in this case, the State Court entered a judgment based on a jury verdict. Moreover, the fact that Debtors filed their petitions prior to the entry of the State Court Judgment does not affect this analysis. *See Casey,* 198 B.R. at 916 (declining to estimate claim based on prepetition jury verdict). Thus, BCT's claim is not unliquidated. Accordingly, because the claim is neither contingent nor unliquidated, estimation, regardless of the applicability of the Rooker–Feldman doctrine, would be inappropriate. Anuco's alleged cessation of operation as a BCT franchise and alleged inability to use BCT's trademarks, trade names, and the "BCT System" do not compel a different result.

## C. Effect of Rejection

 Debtors argue, nevertheless, that Anuco's rejection of the Franchise Agreement changed the basis for the calculation of BCT's claim. Section 365(g)(1) provides that "the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease if such contract of lease has not been assumed under this section or under a plan confirmed under Chapter 11 ... immediately before the date of the filing of the petition." 11 U.S.C. § 365(g)(1) (1998).

Section 502(a) provides for the allowance of claims "unless a party in interest ... objects" to the claim. *See* 11 U.S.C. § 502(a) (1998).

Section 502(b) provides in relevant part that "[e]xcept as provided in subsection ... (g) ... of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim ... as of the date of the filing of the petition...." 11 U.S.C. § 502(b) (1998).

Section 502(g) provides that:

[a] claim arising from rejection, under 365 of this title ... of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(g) (1998).

Invoking § 502(g), Debtors argue that BCT's claim arose before the date of the filing of Anuco's petition. Debtors fail to consider, however, that BCT's claim had already arisen upon the breach of the Franchise Agreement in 1991. Moreover, the jury had reached its verdict concerning that breach *prior* to the petition filings, and the State Court entered its judgment on the basis of that verdict. While it may bear on other issues, such as Debtors' remaining Franchise Agreement obligations at the time of the petition filings, the rejection does not affect the amount of BCT's claim. As noted, the Rooker–Feldman doctrine precludes this Court from disregarding the State Court Judgment, regardless of the time of its entry. "It would stand comity on its head and misuse the limited scope of § 502(c) for a bankruptcy court to proceed as if a nonbankruptcy court or jury had not acted at all when a case has already proceeded to judgment." *Keenan,* 201 B.R. at 266. Thus, Debtors' argument fails.[4]

---

**4.** The fact that only Anuco moved to reject the Franchise Agreement does not change this result.

**40**

### D. Fees

 Finally, with respect to the Nugents' argument concerning BCT's entitlement to legal fees, expenses, and interest, the Court notes *Beguelin v. Volcano Vision, Inc. (In re Beguelin)*, 220 B.R. 94 (9th Cir. BAP 1998). In that case, a debtor had filed a bankruptcy petition after the jury in a state court action had returned a verdict against her. *See id.* at 96. After the bankruptcy court lifted the automatic stay, the state court entered judgment and awarded fees and costs. *See id.* In addressing the issue of whether the bankruptcy court erred in lifting the stay to permit the state court to enter a judgment including fees and costs, the appellate panel found that:

> [w]hen the debtor filed her bankruptcy petition in this case, the jury trial in the state court action was completed except for the determination of punitive damages and the entry of the judgment which included attorneys' fees and costs. The bankruptcy court clearly authorized [the creditor] to obtain "whatever judgment [it could] get in the state court" in order for [the creditor] to determine its claim against the debtor's estate. . . .
>
> The attorneys' fees and costs constituted part of the state court judgment because they were incurred prepetition and were not related to the bankruptcy case. It is clear from the transcript of the proceedings below that the bankruptcy court lifted the automatic stay to allow the entry of the judgment which would include attorneys' fees and costs. It is also clear that it was well within the bankruptcy court's discretion to lift the stay.

*Id.* at 98.

Likewise, in this case, the attorneys' fees and costs "were incurred prepetition and were not related to the bankruptcy case." *Id.* This Court, like the *Beguelin* Court, granted relief from the automatic stay in order to allow the entry of a judgment "which would include attorneys' fees

and costs." *Id.* The Court finds, therefore, that such fees and costs are appropriately included within BCT's claim.

Thus, Debtors' argument regarding the right to a determination of rejection damages fails. Accordingly, the Court finds that the amended proofs of claim properly reflect the amount of BCT's claim

### CONCLUSION

Accordingly, the Courts finds that: (1) res judicata and the Rooker–Feldman doctrine bar the relitigation of Debtors' claims; (2) the Rooker–Feldman doctrine precludes the estimation of BCT's claim pursuant to § 502(c); (3) irrespective of the applicability of the Rooker–Feldman doctrine, BCT's claim is neither contingent not unliquidated, and is therefore not eligible for estimation.

For these reason, the Court GRANTS BCT's motion for summary judgment dismissing the Nugents' Adversary Complaint in its entirety, and DENIES Anuco's and the Nugents' respective motions for estimation of BCT's claim.[5]

An order in accordance with this Opinion shall be submitted.

---

5. The hearing concerning BCT's First Omnibus Motion For an Order Allowing and/or

Expunging Claims in the Nugent case is pending.